SNOWDEN and NORTH *against* The PHŒNIX INSURANCE COMPANY.

1811.

*Philadelphia, Monday, July 22.*

THIS cause came before the court upon a demurrer to the plaintiffs' evidence, which, as far as is material, was as follows:

The defendants on the 31st *October* 1807, underwrote for the plaintiffs a policy for 12,000 dollars, on their ship *Hamlet*, valued at that sum, at and from *Philadelphia* to *Amsterdam*, with liberty in case she should be turned off, to proceed to some neighbouring port of *discharge;* warranted *American* property. The declaration averred that " she never did arrive at *Amsterdam* or such other port of discharge, but was arrested in the course of her voyage by his Britannic majesty's ship *Plover*, and forbid to proceed to *Amsterdam* or any port in *Holland*, but was compelled to go into a port in *Great Britain* or *Ireland*, and on the 4th of *April* 1808, on the coast of *England*, was stranded, sunk, and totally lost by storms, violence of seas &c."

According to the deposition of the captain, the *Hamlet* sailed from *Philadelphia* for *Amsterdam* on the first of *November* 1807, with a cargo of sugar, coffee, pepper, gum, indigo, &c., and on the 10th *December* following, she was boarded by his Britannic majesty's ship *Plover*, *Philip Browne* esq. commander, who indorsed the papers of the *Hamlet* as follows: " H. M. S. *Plover*. At sea 10th *Dec.* '07. " You are hereby directed not to proceed to any port at war

A vessel insured at and from *Philadelphia* to *Amsterdam*, with liberty in case she should be turned off from *Amsterdam*, to proceed to some neighbouring port of discharge, was boarded on her passage by a *British* ship of war, and her papers indorsed with a direction not to proceed to any port at war with *Great Britain*, or which was shut against *British* ships, but to proceed to any port of *Great Britain* or *Ireland* for further directions. She then put into *Falmouth*, where in consequence of head winds, and with a view to obtain convoy, (the captain having there heard of the *Milan* decree,) she remained nearly four months, and then sailed under convoy for the *Downs*, with intent from that place to proceed to *London* or *Amsterdam* according to advice. Shortly before she reached the *Downs*, a gale came on; which forced her into the *Downs*, where she was totally lost. *Held* that the indorsement and warning justified the deviation to *Falmouth*; that the stay at *Falmouth* was justified by the weather, and by the necessity of obtaining convoy; and that even if the *Downs* were out of the course of the voyage to *Amsterdam*, yet the gale justified the captain's going in, and his design before he left *Falmouth* to put in there for advice, was but a mere intention to deviate, which did not affect the policy.

It is not a breach of a warranty of neutrality for the vessel insured to take convoy of a *British* ship of war, if during the voyage insured she has become exposed to the operation of the *French* decrees, in consequence of having been visited at sea by a *British* cruiser.

Upon a demurrer to evidence, every fact which a jury might fairly infer, is to be inferred by the court.

1811.

SNOWDEN
v.
PHŒNIX
INS. COMPANY

"with *Great Britain*, namely, *France*, *Spain*, *Holland*, *Den-* "*mark*, *Italy*, *Liguria*, or any other port that may be shut "against *British* ships, but proceed to any port of *Great Bri-* "*tain* or *Ireland* for further directions. *Philip Browne*." At this time the *Scilly Islands* bore E. N. E. distant about twenty-four leagues. In consequence of the warning and indorsement, the captain proceeded with the ship to *Falmouth*, that being the nearest and most convenient port, and where he deemed it most for the benefit of all concerned to put in. He arrived off the harbour of *Falmouth* on the 13th of *December*, and wrote for advice to Messrs. *George G. Fox and sons* of that place, one of whom was the *American* consul; and on the same day they returned him an answer, approving of his coming in, and informing him, that in consequence of a late order in council, it would be necessary to come into port before he could proceed to *Holland*. He accordingly went into port, where he was quarantined nine days. At the end of that time he received a letter from *Bainbridges and Brown* of *London*, to whom as the agents of the principal shipper on board Messrs. *Fox and sons* had written for advice, requesting him to take a particular clearance for *Amsterdam*, which had been given by order of government, to relieve him from the blockade in which all the ports of *Holland* were involved. On the 23d *December* he took the clearance, (which set out the warning and indorsement) and prepared to proceed on his voyage; but a gale of wind rendered it impossible, and from this time there was a repetition of bad weather, which kept him in port, until he was informed of " certain decrees of the emperor of *France* and the king " of *Holland*," which exposed him to confiscation if he proceeded to *Amsterdam*. On the 28th *January* he received a letter from *Bainbridges and Brown*, telling of some captures of *American* vessels in the channel by *French* privateers, and advising him to sail with convoy for *Portsmouth*, and from thence to come to *London*, that they might confer personally. The captain left his ship at *Falmouth*, and went to *London*, where he arrived the 1st of *February*, and remained there by the advice of *B. and B.* for three weeks, expecting daily to receive information from *Holland*, which would determine him as to proceeding to *Amsterdam*. On the 20th *February*

*B. and B.* delivered him a letter in which, owing to the embarrassments attending the voyage to *Amsterdam*, they advised his proceeding to *Falmouth*, and endeavouring to join the first convoy for the *Downs*, where, upon his arrival, he was to make a signal, and they were to send off their instructions as to further proceedings. The captain arrived at *Falmouth* on the 24th, and not finding convoy he informed *B. and B.* of it, who on the 29th wrote him they had no doubt his *American* insurance covered him to the *Downs*, and advised him if he had no convoy, to proceed immediately with the first fair wind to the *Downs*, where he would find their instructions. The letter proceeded, " we shall then do some " insurance on your ship to *London*, and freight, which can " be done easily." From the receipt of this letter on the 4th of *March* until the 1st of *April*, the wind blew so much ahead that the captain could not sail; but it becoming favourable on the last mentioned day, and the captain having taken a clearance for the *Downs* instead of *Amsterdam*, he sailed under convoy of the *Pickle* schooner, from whom he obtained signals *or* sailing orders. The reason which the captain, in his deposition, assigned for going to the *Downs*, was, that " it would be nearer to his port of original destina- " tion, and where he would have been able to obtain convoy " for the *Texel, if* it had appeared prudent to go there; and " from whence he would have been in a better situation to " avail himself of any further orders or directions relative " to his future operations." On the 4th of *April*, it then blowing very hard, the convoying schooner made a signal for the vessels under her protection to put into the *Downs*, which were then in sight, for a harbour, and where they arrived on the same day in a heavy gale from the southwest. During this gale, it became necessary to run the *Hamlet* ashore, to preserve the lives of the crew and the cargo; and although some materials and the chief part of the cargo were saved, yet the hull of the vessel sunk and was lost.

The plaintiffs on the 28th of *May* 1808 informed the defendants that they had received intelligence of this disaster from *London*, and abandoned.

By the deposition of Mr. *John Bainbridge*, of the house of *Bainbridges and Brown*, it appeared that this house had

**1811.**

**SNOWDEN**
*v.*
**PHŒNIX**
**INS. COMPANY**

not acted as agents for the plaintiffs, but that having insured at *Lloyds* a considerable part of the cargo for Mr. *William Waln*, and consulted with Messrs. *Baring and company* who were correspondents of other shippers, they determined to recommend to the captain to proceed to the *Downs*, " in or-" der that the ship might go either to *Amsterdam*, if from " any information expected to be received, it might be deem-" ed safe, or ultimately to come to *London*;" and in conformity with this, the first letter from their correspondents at *Deal* informing them of the *Hamlet's* arrival in the *Downs*, said of the captain, " he requested us to inform you that he " is waiting your orders, *whether to proceed to London or* " *Holland.*" By the same testimony it appeared, that no *East India* goods, cotton goods excepted, could be landed any where in *England* but in *London*.

The deposition of a captain *Isaac Silliman* was also read in evidence, in which he stated, that at the close of *March* 1808, *American* vessels were very much exposed to *French* capture in going from *Falmouth* toward the *Downs*, and that he had about that time taken a message from *B. and B.* to the captain of the *Hamlet*, requesting him not to sail without convoy.

In the letter of instructions which the plaintiffs addressed to the captain on the 18th of *October* 1807, they did not point out any port of discharge to which he should go, in case he was turned off from *Amsterdam;* but in addition to some general instructions, he was merely told in case of capture or being turned out of his voyage, to make the proper protests.

Upon this evidence the jury assessed damages conditionally for the plaintiffs at 11846 dollars 96 cents.

*Hallowell* and *Rawle* contended that judgment should be entered for the defendants. They conceded that the party demurring admits the evidence to be true, and also admits every conclusion or inference from the facts which a jury might *fairly* draw. *Baker's case* (a), *Stephens* v. *White* (b), *Pawling* v. *The United States* (c). But they argued that the evidence conclusively established two points, either of which

(a) 5 *Rep.* 104.      (b) 2 *Wash.* 210.      (c) 4 *Cranch.* 219.

was fatal to the claim. 1. A deviation. 2. A breach of the warranty of neutrality, by sailing under *British* convoy.

1. Upon being turned off from *Amsterdam*, the *Hamlet* was at liberty to go to a neighbouring port of discharge, and no where else, under the policy. *Falmouth* was not that port, because the cargo was of a kind which could not have been discharged there. It was the duty of the captain to go at once to such a port, upon being warned by the *Plover;* and if his instructions did not provide him with one, we shall see that that does not excuse the deviation. Be this however as it may, the instant he sailed from *Falmouth*, without a fixed ascertained port to which he was to go, he committed a deviation; he was not sailing for any port permitted by the policy. The reason which the captain assigns for going to the *Downs*, is that he might there get convoy to the *Texel*, if it should be thought prudent to go there. The deposition of Mr. *Bainbridge* says the *Downs* were selected that the captain might there receive orders to go to *London* or *Amsterdam*. The letter from *Deal* to Messrs. *Bainbridges and Brown* before the loss, says, he is waiting your orders to proceed to *Holland or London;* and the captain, though he first took a license for *Amsterdam*, gave it up before sailing, and obtained a clearance for the *Downs*. Every thing therefore was unsettled, until he reached the *Downs*. He did not take it as a port of discharge; it was not the port of his original destination; it was a mere place of deliberation, precisely like *Falmouth*, and which the policy did not permit him to take, because there was no necessity for it. He was already in a situation to receive and to follow any instructions while lying at *Falmouth;* and a little greater convenience in being something nearer to the persons whom he consulted, was not the slightest justification for the change.

A necessity for going into port, out of the course of the voyage, must be made out beyond the possibility of doubt, and that it did arise and exist *without any default of the master or party insuring*. *Woolf* v. *Claggett*. (a) The justifications for this kind of deviation usually are to repair the vessel, to escape a storm, or to avoid an enemy. *Park*. 400., *6th ed*. But there was neither cause here. If the vessel was

(a) 3 *Esp.* 257.

neutral, she had no enemy. The orders in council and the *Milan* decree, were illegal; and under the law of nations, the captain would have been safe in proceeding. The policy would have covered him to *Amsterdam*, notwithstanding the indorsement.

The whole difficulty arose from the omission of the plaintiffs to furnish the captain with proper instructions. Had a port of discharge been pointed out to him, he would not have gone to *Falmouth*, since *London* was the only port of discharge in *England* for the greater part of his cargo. Going to *Falmouth* therefore was not excusable. It sprung from the plaintiffs' neglect; and it was an unpardonable neglect, because by the policy they shew that the event was contemplated.

Going to the *Downs* was equally without excuse; and it was not done by the judgment of the captain, as the best for all concerned, but with a view to obtain instructions from persons who had no control over the ship, and were not the agents of the plaintiffs. In this instance also the instructions were defective. Upon the same principle that a letter of instructions should contain nothing to increase the risk, it should contain such directions as would enable the captain to meet it in a case likely to occur. *Sperry* v. *The Delaware Ins. Company*. (a) If it be said that his destination after leaving *Falmouth* was *Holland*, unless he received orders to the contrary at the *Downs*, the answer is, that the *Downs* are out of the course of that voyage. The course from *Falmouth* to *Amsterdam* is on the outside of the *Goodwin* sands, as is clear from the charts in court.

The argument against a deviation allows the assured to have a port at *Falmouth*, another in the *Downs*, and a third either at *Amsterdam*, or *London;* whereas the policy confines the assured to the alternative of *Amsterdam* or a port of discharge, and in that order. If turned off, he was bound to go to a port of discharge, being tied down to the voyage, and the order of the voyage prescribed in the policy. *Beatson* v. *Haworth* (b), *Hogg* v. *Horner* (c), 2 *Emerig.* 32. The mere turning off, without the alternative clause in the policy, would not have authorized him to go any where else, at the risk of the underwriters. *Parkin* v. *Tunno.* (d)

(a) 1 *Cond. Marsh.* 473. *note.*        (c) *Park.* 394. 6th ed.
(b) 6 *D. & E.* 531.                      (d) 11 *East*, 22.

2. A warranty of neutral property is an engagement that no act of the assured or his agent shall destroy its neutral quality during the voyage. When he places himself under convoy of one of the belligerents, it must be for the purpose of resisting search by the other, which is unneutral conduct, and exposes the property to condemnation. *The Maria*, (*a*) which was the case of the *Swedish* convoy, contains the most convincing arguments upon this point. It is of no importance that the belligerent against whom convoy was taken, was in the practice of making unjustifiable aggressions upon our commerce. So long as our government chooses to maintain the neutral character, it must acknowledge the belligerent right of search; so long must its citizens permit the exercise of this right, and be bound to the performance of every neutral duty which could be exacted from them in the most regular state of the world. So at least a court of justice must say; and therefore until otherwise directed by law, they must continue to understand the warranty in the policy, in the same sense in which neutrality would be taken during a period of the general prevalence and authority of the law of nations.

If the plaintiffs had not a right to take convoy, this goes also to the point of deviation, as the captain remained at *Falmouth* a long time to obtain it.

*Tilghman* and *Ingersoll* for the plaintiffs.

1. Upon the point of deviation, the only question by the defendants seems to be, whether sufficient instructions were given to the captain by the assured; but it is wholly overlooked, that the *British* orders of *November* were passed after the *Hamlet* left the *United States*, so that no human foresight could have met the case which happened. Besides, if a neighbouring port had been provided, which undoubtedly meant a port on the continent, yet the warning and indorsement would have intirely defeated such an arrangement. The *Hamlet* was ordered to *Great Britain* or *Ireland* for further directions, and the captain had no alternative, unless he intended rashly to throw away his vessel, but to obey the order. He therefore sought *Falmouth*, not as a port of discharge,

1811.

SNOWDEN
*v.*
PHŒNIX
INS. COMPANY

(*a*) 1 *Rob.* 287.

SNOWDEN
v.
PHŒNIX
INS. COMPANY

nor in prosecution of the voyage expressed in the policy, but as the nearest port to obtain information for the benefit of all concerned. No one can say that the necessity of going into that port was not as imminent, as if it had been to avoid an enemy. The cases in *Park*, are but examples; the present case comes within precisely the same rule. He lost no time in recurring to the best advice; but even his advisers, well informed as they were, were embarrassed. They considered his original port as the best, and it is but a fair inference from the evidence, to say that the intention of going there, if possible, was uniformly preserved by the master. If that voyage could not be prosecuted, *London* was undoubtedly contemplated as the alternative port; and so it might be within the policy.

Not a day was lost by unnecessary delay at *Falmouth*, until the *Milan* decree was communicated, and then convoy became essential for the safety of the vessel. Its effect upon the warranty is another point. Captures of *American* vessels were made under this decree, within sight of the very shores of *England*. It was dangerous to proceed from port to port except under the protection of an armed force; and therefore, still following the advice which was given him, captain *Jackson* waited for convoy. If it was lawful to take convoy, the delay for that purpose is excused, because from the evidence it was clearly necessary.

When she left *Falmouth* for the *Downs*, her destination was *Amsterdam*, if the intelligence obtained, and to be forwarded to him thither, should justify it. One of the reasons he assigns for selecting that point, was to get convoy for the *Texel*. He had been at one period so sanguine in the hope of reaching his original port, that he had taken a license for *Amsterdam*, which he afterwards exchanged. The *Downs* were in the course of that voyage. The jury would have inferred it from their geographical knowledge, and also from the letter of *Bainbridges and Brown* that his *American* insurance covered him to the *Downs*, which it would not have done, unless they were in the course to *Amsterdam*.

But putting the case in the strongest manner against the plaintiffs, the evidence shews at most but an intention to deviate. The vessel was still in the course to *Amsterdam*, when

the gale compelled her to go in. It was of course an involuntary departure, which has no effect upon the contract.

1811.

SNOWDEN
v.
PHŒNIX
INS. COMPANY

The recent cases in *England*, however, go so far as to decide, that where the port of destination is shut to the assured, and he either goes out of his course, or lies by, with a view of ultimately getting to it, the policy continues in force. *Blackenhagen* v. *The London Assurance Company*. (a)

2. It is truly said that the assured engages by the warranty that the neutral character shall not be compromitted by himself or his agent. Against the effect of any order or decree of a foreign nation he does not warrant. In the present case the *Milan* decree stript the *Hamlet* of her *American* character. The first article of it denationalized her, and made her good prize wherever found, in consequence of an event, which the captain could not by possibility have prevented, the visit of a *British* vessel of war. It was the act of *France* herself to destroy the neutrality of this ship. She was declared to be a *British* vessel, a belligerent. No neutral duties were thereafter to be exacted from her; and, of course, taking convoy against the privateers of *France*, was not unneutral conduct, for her neutral character had been previously destroyed. Taking convoy is in ordinary times useless to a neutral. It is under certain circumstances, an offence to a belligerent, and he captures and condemns in consequence of it, because he claims a right to search all neutral vessels. But if this vessel had been captured while under convoy, she would have been condemned not as a neutral resisting search, but as an *American* denationalized by the visit of a *British* cruiser; and it was therefore highly beneficial to the underwriter that convoy should be taken. A theoretical argument may no doubt be raised the other way; but practically, if a neutral is treated like a belligerent by one of the powers of war, our courts will reject the theoretical reasoning, and allow her to use the protection of a belligerent, as being involuntarily in a partial state of war. In *Talbot* v. *Seeman* (b) the Supreme Court of the *United States* gave salvage for the recapture of a neutral from the

---

(a) 1 *Campbell* 454.           (b) 1 *Cranch*. 1.

*French*, because in point of fact, an illegal decree of *France* would have condemned her as good prize; yet in such a case by the law of nations the neutral was in no danger. This case ought to be decided upon the same ground.

TILGHMAN C. J. In this case the defendants demurred to the plaintiffs' evidence. The consequence is, that every fact which might have been fairly inferred by the jury, is to be inferred by the court.

The defendants' counsel make two points. 1st, That the underwriters are discharged by a *deviation* from the voyage insured. 2d, That the warranty of *American* property was broken by sailing under convoy.

1. A deviation is a voluntary and unnecessary departure from the course of the voyage insured. Here was certainly a departure, but was it unnecessary? We must consider the case under several points of view. 1. As to the going into *Falmouth*. 2. As to the sailing from *Falmouth* to the *Downs*. 1. There is much to be said in justification of going to *Falmouth*. The danger of proceeding to *Amsterdam* after the indorsement on the papers, was imminent. It matters not whether the *British* orders in council were legal or illegal. I will take it for granted they were illegal, still the danger of proceeding in defiance of them was not the less. The *British* had a force at sea sufficient to carry their orders into effect. What would have been the effect on the policy, had the captain proceeded towards *Amsterdam* after the indorsement of his papers and been captured, is another question. There is enough to shew that the departure from the voyage was not voluntary, but for the purpose of avoiding great danger. It was contended, that inasmuch as the policy provides for the case of being *turned off* from *Amsterdam*, and gives permission in such case, to proceed to some neighbouring port of discharge, the captain had no right to go to *Falmouth*, but should have proceeded immediately to *London*. But the case which happened is not exactly the case provided for; there was not only a *turning off* from *Amsterdam*, but a prohibition to go to any other than a *British* port. This was an event not in the contemplation of the parties, and produced by the *British* orders in council made after the commencement of the voyage. In the unexpected situation, then, in which the

1811.

SNOWDEN
v.
PHŒNIX
INS. COMPANY

captain was placed, after the indorsement of his papers by the *British* captain, there was nothing improper in his putting into the nearest port, where he might procure good information of the state of public affairs, and regulate his conduct as circumstances should require. I do not say that the policy would not have covered him, if he had proceeded immediately to *London;* but he was not obliged to do so. Objections have been made to the conduct of the captain in remaining so long at *Falmouth.* But if he is to be believed, and the jury would have been justified in believing him, his stay is accounted for by adverse winds, before the *French* decree was heard of, and afterwards by the danger of proceeding without convoy. It is said that the *Downs* are out of the course from *Falmouth* to *Amsterdam.* I doubt whether the proof of that was quite satisfactory; but suppose it to have been so, the captain swears, that the gale came on before he entered the *Downs,* and that the going in was for a harbour, in pursuance of a signal from the convoying ship. If that was the case, there was only an *intended* deviation at most, for the *actual going in* to such a harbour in a storm was not voluntary, and therefore not a deviation. An intention to deviate will not make a policy void.

2. The second point is new, and not without difficulty. Was the warranty broken by sailing under convoy? No case has been cited, which is at all applicable. The case of the *Maria,* the *Swedish* convoy, 1 *Rob.* 287., is very different. There the merchant ships were sailing under convoy, for the express purpose of resisting a search; in other words, of violating a right vested in belligerents by the law of nations. But the present is not simply the case of a neutral sailing under convoy, nor will I give any opinion on such a case, because the convoy which is the subject of our inquiry was resorted to under very particular circumstances. Long after the commencement of the voyage, the captain heard for the first time, of a very extraordinary decree made by the emperor of *France* at *Milan.* By this decree, the *Hamlet* was subject to confiscation, because she had been *visited* by a *British* ship of war. This visitation was an act of force, not of consent; an act which the captain of the *Hamlet* was unable to resist. Yet by the *French* decree, the ship was stript

of her neutral character, or, as it is said, *denationalized.* It was not the captain then who threw off his neutral character by any voluntary act, it was torn from him by violence. If he had proceeded without convoy and been captured by the *French,* he would have been subject to condemnation. The taking of convoy therefore was in all human probability, for the benefit of all concerned. General rules must give way in cases of extreme necessity. Granting it to be unlawful for a neutral to sail under convoy in general, yet it is not so, when during the voyage, the belligerent against whom convoy is taken, puts the neutral in a state of outlawry without just cause. If the law of nations forbids a neutral to put himself under the protection of a belligerent, the same law affords him protection while he is pursuing his voyage in a peaceable manner, after being *visited* by a belligerent whom he had no power to resist. Indeed I might add that he had no *right* to resist the *visit* and *search* of either of the belligerents, and if he did, he incurred the penalty of confiscation. Here then is a new and singular case. The captain of a neutral vessel having committed no fault, finds himself involved in the penalty of confiscation. In such a dilemma, the common rules of action appear to me to be dispensed with. The neutral is justified in acting so as to meet the emergency of the occasion. The warranty which bound him to conduct himself in all respects as a neutral, is not broken, when compelled by the violence of a belligerent, he seeks refuge from a danger to which as a neutral he ought not to have been exposed. If authority were wanted for what seems sufficiently evident, the case of *Talbot* v. *Seeman*, 1 *Cranch.* 1., justifies me in saying, that in new and extraordinary cases, new principles must be adopted. By the general law of nations, if a neutral is captured by a belligerent and re-captured, no salvage is due, because no service is performed, it being presumed that the courts of the captor would have done justice to the neutral. But salvage is allowed on a re-capture, where it is evident that the neutral was not in safety in the hands of the captor, because, if carried into port, the courts would have condemned him. Suppose *France* had declared war against the *United States* after the commencement of the voyage, might not the captain have put himself

under *British* convoy without breach of the warranty? Surely he might, and why? Because, without his consent or default he had been forced out of a state of neutrality before he went under convoy. Now for the purpose of the present argument, I see no difference between a declaration of war and the decree of *Milan.* That decree subjected the neutral ship to condemnation for no fault committed, either by the nation or the individual, and a declaration of war could have done no more. Upon the whole, it appears to me that the act which is complained of as a breach of neutrality, was not resorted to, until the decree of *Milan* had rendered it impossible to support a neutral character. The vessel was proscribed and subjected to confiscation. In that situation the warranty was not broken, by departing from the line of conduct prescribed to neutrals in general, and taking the step which seemed best calculated to avoid the impending danger.

1811.

SNOWDEN
*v.*
PHŒNIX
INS. COMPANY

YEATES J. The defence in this suit rests on two grounds. 1. That *John Jackson* captain of the ship *Hamlet* has been guilty of a deviation. 2. That by his conduct the plaintiffs had forfeited their neutral rights.

1. The voyage insured was at and from *Philadelphia* to *Amsterdam*, with liberty in case she should be turned off from *Amsterdam*, to proceed to some neighbouring port of discharge.

The evidence is altogether written; and by the defendants demurring thereto they admit not only the facts stated therein, but also every conclusion which the jury might fairly and reasonably infer therefrom. [His honour then stated the material facts, and proceeded as follows.]

So far am I from concurring with the defendants' counsel, that a deviation appears upon the evidence, that I am fully persuaded there was no intention to deviate from the usual course of the voyage insured. The two great belligerent *European* powers, *Great Britain* and *France*, had made certain naval regulations, unknown to the ancient code of maritime law, and highly injurious to neutrals. The indorsement of the *Hamlet's* papers, that she should not proceed to any port at war with *Great Britain*, or that might be shut against *British* ships, justified her putting into *Falmouth.* The ne-

cessity on the captain was equally imperious, as if she had been forced thither by storms and tempests. I think the captain acted *bona fide*, with sound discretion, for the benefit of all parties concerned, by going into that port, and determining to prosecute his voyage when it might be done with reasonable safety. If he had attempted to proceed immediately to *Amsterdam*, and had been captured, the underwriters would readily have found out a defence in his obstinacy and temerity. The *Hamlet's* cargo consisted chiefly of *East India* goods, and it appears by the evidence they could only be discharged in the port of *London*. How matters might eventuate between the two conflicting kingdoms was wholly uncertain. The *British* orders in council, or the *French* decrees might receive relaxation. It was prudent to wait for further information, in the actual state of the political horizon. The captain might well meditate *London* as a port of discharge provisionally, in case no rational prospect was opened to him of reaching *Amsterdam;* and the *Downs* was a safe and convenient harbour between the two ports. In fact it appears, that the day succeeding the expiration of the *Hamlet's* quarantine at *Falmouth*, he obtained his clearance for *Amsterdam*. His object was to obtain information of the probable measures of the two adverse nations, and he actually went into that harbour in a strong gale of wind, under a signal from the convoying schooner. I cannot impute blame to him for his conduct. He had never abandoned his original voyage. If a ship with goods on board insured to a foreign port, learns on her voyage that an embargo is there laid on all goods of her nation, and waits at some place as near thereto as she safely can till the embargo is removed, the goods will in the mean time be protected by the policy, while the voyage remains legal. *Blackenhagen* v. *The London Assurance Company*, 1 *Campb.* 454.

2. As to the *Hamlet's* being guilty of a breach of neutrality, by being put under the convoy of the *British* armed schooner at *Falmouth*, I agree that a neutral vessel sailing under convoy of an armed ship of one of the belligerent nations for the purpose of resisting visitation and search, is liable to condemnation by the laws of war. It would in general cases be an adoption of the character of the convoying

nation. To form however a correct idea of this point in the present instance, we must consider the pretensions of *France* in this state of warfare with *Great Britain*. Her decrees profess to confiscate neutral vessels which have been visited on the high seas by *British* cruisers, and thereby directly invade and violate the rights of *America*. The just claims of the *United States* cannot be concluded by such arbitrary ordinances. The captain of the *Hamlet* could not prevent his vessel being visited by the commander of the *Plover*, nor the indorsement of his papers. It cannot reasonably be said that in his passage from *Falmouth* to the *Downs* he should proceed with folded arms, wholly insensible to danger from the *French* picaroon privateers, which infested the *British Channel*, in the prosecution of a voyage strictly legal. The private as well as public duties of captain *Jackson* forbade such a line of conduct, and he was justifiable under existing circumstances in sailing under the protection of convoy. The *Milan* decree of the 17th *December* 1807, puts the *United States* and *France* in a kind of partial war. It is the settled doctrine of the law of nations, that a neutral vessel captured by a belligerent is to be discharged without paying salvage, for being in no danger, she receives no benefit from recapture, and ought not therefore to pay salvage; yet in *Talbot* v. *Seeman*, 1 *Cranch.* 1., salvage was allowed to an *United States'* ship of war, for the recapture of a *Hamburgh* vessel out of the hands of the *French*, though neutral towards each other, on the ground that she was in danger of condemnation under the *French* decree of 18th *January* 1798.

Upon the whole, I am of opinion that captain *Jackson* has not been guilty of a deviation, and that the *Hamlet* did not forfeit her neutral character by sailing under convoy from *Falmouth;* and that judgment be rendered for the plaintiff.

BRACKENRIDGE J. The insurance was at and from *Philadelphia* to *Amsterdam*, with liberty, in case of being turned off from *Amsterdam*, to proceed to some neighbouring port of discharge. The vessel in this case was turned off from *Amsterdam*, but she did not proceed to *a port of discharge*; for it appears from the evidence, that such was the nature

*margin:* 1811.

SNOWDEN
v.
PHŒNIX
INS. COMPANY

1811.

SNOWDEN
v.
PHŒNIX
INS. COMPANY

of the cargo, that it could not be discharged at *Falmouth*, to which port she did proceed on being turned off from *any port shut against British ships*. It is clear therefore that the proceeding to this port was not within the terms of the policy; more especially as it subjected to the delay of quarantine, and for a great length of time, nine days. The harbour of *Falmouth* off the castle of *Pendennis*, might not be out of the direct course of the voyage, and as it did not subject to quarantine to lie off here, it might not be a deviation; but I am clear that the entering the port of *Falmouth*, with the quarantine to which it subjected, was a deviation, and, *other things out of the way*, would discharge the underwriter.

But having entered the port of *Falmouth*, a clearance from it became necessary; and " it is a known and established rule " with respect to a vessel, that if she is navigated under a pass " to a foreign country, she is considered as bearing the charac- " ter of that nation under whose pass she sails. She makes a " part of its navigation, and is in every respect, liable to be " considered as a vessel of that country." 1 *Rob.* 11. The right of search seems to follow from the necessity of ascertaining by search the neutrality of the vessel and cargo, or of any part. A neutral taking convoy obstructs the exercise of this right in a belligerent, and is considered as putting off her neutral character. It is amongst the standing interrogatories to be put to any one examined as a witness in case of capture, " did the ship sail under convoy, and for " what purpose, and to whom did such convoying ship be- " long?" 1 *Rob.* 325. Independent of authority, the act of taking convoy from one belligerent, would seem on every principle of reason to be a forfeiture of neutrality. It cannot be a consideration whether the belligerent, to protect against whom the convoy is taken, has made regulations contrary to the law of nations. The insured must not undertake to judge of that in taking convoy from another belligerent. For admit the right to judge of this in one case, and you must in all. It is deciding upon the illegality, and calling on one belligerent to protect against it, on the invasion of the other. It is in fact allying with one against the other *for defence at least*. For these and other reasons, it would seem to be the

1811.

SNOWDEN
*v.*
PHŒNIX
INS. COMPANY

law, that the taking convoy is a forfeiture of the neutral character, and discharges the underwriter. The taking convoy in this case therefore, which appears from the evidence to have been done, other circumstances out of the case, would seem to discharge the underwriter.

But what occasioned the entering the port of *Falmouth,* and the taking convoy?

It was the *preceding visitation of the British* ship *Plover, Philip Brown* commander, and the indorsement of the papers of the said ship *Hamlet,* the ship insured. The visitation and indorsement were not a turning away merely from *Amsterdam,* or other port, but an *order to proceed* to any port of *Great Britain* or *Ireland* for further directions. Is it possible to consider the boarding by the *British* ship of war, and the indorsement of the ship's papers, *as less than a capture?* A prize-master was not put on board, nor with the *Milan* decree ahead, was it necessary. The indorsement of the papers carried the vessel as certainly to a port of the *British* empire, as if a prize-master had been put on board. An iron collar put on the neck of a slave, could not more effectually secure against his running away, than this indorsement secured to a *British* port the vessel in question. Whether this capture, as it may be called, was with a view to condemnation, or but to a *qualified appropriation of the property, the securing the trade or duties to themselves,* must be immaterial; for to a certain extent, even in that case, it must be considered *as a taking.* Was not this *arrest,* or *restraint* of the belligerent, a risk within the policy? It would seem to me that it must be considered as a peril insured against, and which intitles to abandon. *It is on this ground, and on this only, that I think the insured intitled to recover.* The legality of the *Milan* decree cannot come into view; it is the actual force only, as in the case of piracy, or a hurricane, that can be considered. It was the visitation of the *British* ship, and the indorsement of the papers that subjected to this; and in fact I am not able to see that the indorsement or marking the property in this manner, did not make it *British,* so as to subject it to a right to abandon.

After this capture or detention by which the voyage may be considered as broken up, the assured would seem by their

agents, to have laboured in and about the subject of the insurance, with all reasonable judgment, for the use of those concerned; and under the circumstances to have done the best advisable, so as not to devest the right of abandonment which had accrued. It would seem to have been doing the best that under the circumstances of the case could have been done, to enter the port of *Falmouth*, to wait for intelligence, to take convoy and proceed as was done. The loss that happened was not owing to misconduct, but to accident; and not of that nature as to be a departure from the engagement express or implied of doing the best for the interest of those concerned. I am therefore of opinion, that the insured are intitled to recover.

*Judgment for plaintiffs.*